## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| JAN DURBIN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MEDPACE HOLDINGS INC., AUGUST JAMES TROENDLE, JESSE J. GEIGER, and KEVIN M. BRADY,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Jan Durbin ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to her own acts, and upon facts obtained through an investigation conducted by her counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Medpace Holdings Inc. ("Medpace" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Medpace's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Medpace common stock between April 22, 2025 and February 9, 2026, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.     Defendants provided investors with material information concerning Medpace's expected book-to-bill ratio for the fourth quarter 2025. Defendants' statements, among other things, portrayed an overly optimistic book-to-bill ratio of 1.15 throughout the Company's fiscal year. Particularly, Medpace continuously made statements during earnings calls focused on the Company's anticipated book-to-bill ratio of 1.15 during the second half of fiscal year 2025.

3.     Defendants provided these positive statements to investors while, at the same time, disseminating false and materially misleading statements and/or concealing material adverse facts concerning the true state of Medpace's backlog cancellation rate. In fact, Defendants continuously touted "well behaved" cancellation rates. Furthermore, Medpace made clear that cancellations were not caused by weak business or a weak funding environment, providing investors with overly positive growth expectations that could not maintain the projected 1.15 book-to-bill ratio. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Medpace's common stock at artificially inflated prices.

4.     Investors began to question the veracity of Defendants' public statements on February 9, 2026, when Medpace issued a press release announcing the Company's fourth quarter 2025 book-to-bill ratio of 1.04, well below the guidance of 1.15.

5.     Investors and analysts reacted immediately to Medpace's revelation. The price of Medpace's common stock declined dramatically. From a closing market price of $530.35 per share

2

on February 9, 2026, Medpace's common stock price fell to $446.05 per share on February 10, 2026, a decline of more than 15.9%.

## JURISDICTION AND VENUE

6. Plaintiff brings this action, on behalf of herself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as a significant portion of Defendant Medpace's business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11. Plaintiff purchased Medpace common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing her transaction(s) in Medpace is attached hereto.

12. Medpace Holdings Inc. is an international corporation with its principal executive offices located at 5375 Medpace Way, Cincinnati, OH 45227. During the Class Period, the

3

Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "MEDP."

13.    Defendant August James Troendle ("Troendle") was, at all relevant times, the Chairman and Chief Executive Officer of Medpace.

14.    Defendant Jesse J. Geiger ("Geiger") was, at all relevant times, the President of Medpace.

15.    Defendant Kevin M. Brady ("Brady") was, at all relevant times, the Chief Financial Officer and Treasurer of Medpace.

16.    Defendants Troendle, Geiger, and Brady are sometimes referred to herein as the "Individual Defendants." Medpace together with the Individual Defendants are referred to herein as the "Defendants."

17.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Medpace's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

4

18.     Medpace is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

19.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Medpace under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

20.     Medpace is a clinical contract research organization (CRO) focused on providing scientifically-driven outsourced clinical development services to the biotechnology, pharmaceutical, and medical device industries. The Company's operating model centers on providing full-service Phase I-IV clinical development services and therapeutic expertise.

### *The Defendants Materially Misled Investors Concerning*

### *Medpace's Projected Book-to-Bill Ratio for Fourth Quarter 2025*

### *April 22, 2025*

21.     On April 22, 2025, Medpace hosted an earnings call wherein management detailed the results for first quarter 2025, as well as guidance for the year. In relevant part, President Geiger stated:

> Thank you, and good morning, everyone. Revenue for the first quarter of 2025 was $558.6 million, which represents a year-over-year increase of 9.3%. Net new business awards entering backlog in the first quarter decreased 18.8% from the prior year to $500 million, resulting in a 0.9 net book-to-bill. And ending backlog as of March 31, 2025, was approximately $2.8 billion, a decrease of 2.1% from the prior year. We project that approximately $1.61 billion of backlog will convert to revenue in the next 12 months, and backlog conversion in the first quarter was 19.2% of beginning backlog.

22.     As part of the earnings call, Defendants answered questions from analysts, in pertinent part:

5

<Q: Maxwell Andrew Smock – William Blair – Analyst> August, you mentioned I think you can get back to 1.15 book-to-bill in the back half of the year, if you get that improved climate. I guess my question would be, what do you think bookings look like if you don't get that improved at climate? And then in that scenario where we assume even a stable environment from here, how much downside is there to the top line this year? And then what would that imply for top line growth in 2026?

<A: August James Troendle> How much risk is it a top line this year? You mean bookings? Or are you talking about revenue -- second half?

<Q: Maxwell Andrew Smock – William Blair – Analyst> Yes, more impact on revenue in the second half. I guess 3 parts, right? If the environment is stable from here? What does book-to-bill look like in the back half of the year? How much downside is there to how you're thinking about revenue in the back half and the end of your guidance for this year? And then what does that all imply for top line growth in 2026?

<A: August James Troendle>

Yes. Well, that's kind of a difficult hypothetical, what kind of downside is there? That depends on how bad the environment gets if cancellations continue kind of the way they have of recent past and particularly this past quarter and some of the quarters last year. We're going to be in the same kind of place we've been, somewhere around 1, I guess. I think that's kind of the downside. But we still have opportunities to, again paths toward getting to 1.15.

Revenue in the second half is pretty much locked in, that's kind of a different issue because that's a different cancellation. It would be a more later-stage cancellation to knock our revenue off. Now that's possible. And of course, we continue to have clients with funding difficulties that we have to stop work on and -- or cancel the project because of work. So there's still some risk to second half revenue, but most of that is pretty locked in. And I really don't have a model for '26. So I can't go there yet. And the environment is just too early to really talk about 2026 revenue impact of poor bookings through this year.

<Q: Maxwell Andrew Smock – William Blair – Analyst> Yes. Understood. And then maybe frame me as the downside scenario wasn't very -- I was thinking more, but if things stay the same, stay the way they are today, and you don't get that improved climate. And just to confirm, if that is the case and we're talking book-

6

to-bill kind of around 1.0 in the back half of the year versus if you do get that improvement, do you still think it can get to 1.15?

<A: August James Troendle> Correct.

*July 22, 2025*

23. On July 22, 2025, Medpace hosted an earnings call wherein management detailed the results for second quarter 2025. CEO Troendle stated, in pertinent part:

Good day. RFP flow in Q2 continued to be strong, and we saw an increase in rate of decisions. Total pending RFP dollars were down on the quarter and our award notifications were strong. Cancellations were down across the pipeline and awards recognized in the backlog were the highest in the past 5 quarters with a book-to-bill of 1.03x in the second quarter of 2025.

We continue to see a strong potential for book-to-bills returning to above 1.15x in Q3. Although funding challenges remain acute for many of our clients, the large majority of those clients with ongoing studies were able to obtain sufficient funding to keep the trials running. The funding environment has been stable to improve.

Due to several factors, including better funding than anticipated, fewer cancellations, accelerated client decisions, rapid project start-up, shifting mix away from oncology and toward faster burning therapeutic areas and significantly higher investigator costs, we now anticipate accelerating revenue in the second half of the year. As a result, our revenue guidance has been raised by $280 million at the midpoint.

24. Also as part of the earnings call, Medpace's management answered questions from analysts, in relevant part:

<Q: Ann Kathleen Hynes – Mizuho – Analyst> Great. Could you just let us know what your booking expectations are for the second half? And the reason being is that your burn rate stepped up in 2Q and obviously, your guidance implies a step-up in 3Q and 4Q. And I'm just trying to figure out what that means for 2026 revenue growth. I know you don't probably want to give guidance for 2026. But do you expect an acceleration in bookings for the second half to support growth in 2026?

<A: August James Troendle> Yes. As I said in my prepared comments, we do believe that there's a reasonable chance of getting book-to-bills back over 1.15x, which implies a considerable increase in bookings as our revenue is also growing. So yes, we do expect bookings to increase. Now again, that's always dependent upon cancellations, which were very well behaved in this quarter. But last quarter,

7

they were terribly high. So if things continue in the trend we saw in this quarter, then yes, we expect bookings to remain strong through the remainder of the year.

<Q: Ann Kathleen Hynes> And can you provide any more information on cancellations?

Like what was the rate this quarter versus what had been trending the past couple of quarters?

<A: August James Troendle> Yes. We don't disclose the actual rate, but it was down across the entire portfolio. So both sort of the non-backlog awards before they get the backlog was very low. And our backlog cancellations that have been at or above the upper range of what we'd consider normal. They're actually toward the lower end of expectations or usual history in this past quarter in Q2. So they were actually very well behaved. And that, of course, made us exceed what we thought we were going to do in terms of both bookings and overall performance in terms of revenue and EBITDA.

### *October 23, 2025*

25.    On October 23, 2025, Medpace hosted an earnings call wherein management detailed the results for third quarter 2025. CEO Troendle stated, in pertinent part:

Good day, everyone. Cancellations were well behaved in Q3, permitting record net bookings and a net book-to-bill of 1.20. RFP quality remains solid with decisions progressing on a usual tempo. Initial award notifications were strong, and our total dollar value of awarded work not yet recognized in the backlog was up approximately 30% in Q3 on a year-over-year basis. We are making good progress toward refilling our pipeline of opportunities.

We will provide 2026 guidance when we report full year 2025 results in February. However, I will provide a brief preliminary view in an attempt to avoid significant divergence between our view and analyst models. We anticipate 2026 revenue to grow in a low double-digit range off our updated 2025 full year guidance. We expect EBITDA to grow at a high single-digit pace or greater. We believe pass-through costs will remain high compared to historical levels and represent between 41% and 42% of revenue.

26.    Also during the earnings call, President Geiger stated, in relevant part:

Good morning, everyone. Revenue in the third quarter of 2025 was $659.9 million, which represents a year-over-year increase of 23.7%. Net new business awards entering backlog in the third quarter increased 47.9% from the prior year to $789.6

million, resulting in a 1.20 net book-to-bill. Ending backlog as of September 30, 2025, was approximately $3 billion, an increase of 2.5% from the prior year. We project that approximately $1.84 billion of backlog will convert to revenue in the next 12 months, and our backlog conversion in the third quarter was 23% of beginning backlog.

27.     During the earnings call, CFO Brady provided updated guidance for fiscal year 2025, in pertinent part:

> Moving now to our updated guidance for 2025. Full year 2025 total revenue is now expected in the range of $2.48 billion to $2.53 billion, representing growth of 17.6% to 20% over 2024 total revenue of $2.11 billion. Our 2025 EBITDA is now expected in the range of $545 million to $555 million, representing growth of 13.5% to 15.6% compared to EBITDA of $480.2 million in 2024. We forecast 2025 net income in the range of $431 million to $439 million.

28.     As part of the earnings call, Medpace management responded to questions from analysts, in relevant part:

> <Q: Charles Rhyee – TD – Analyst> Obviously, congrats on the quarter here. When we think about sort of the kind of ranges that you've given for next year, how should we think about the pass-throughs in relation to maybe the increase in metabolic work? Obviously, we saw another increase here as a percent of total revenue to 30% in the third quarter from 25% in the first half. But you're still calling out for pass-throughs to remain stable in '26 at that sort of 41% to 42% range. When we think out of your current bookings, are you seeing less metabolic trials compared to your current burn? Or should we expect to see some kind of leveling off in terms of the higher metabolic mix?

> <A: August James Troendle> Yes. I think over the course of '26, it will level off some and might even come down a little bit. But -- and it isn't just the shift to metabolic studies. That is the largest driver, which we've talked about, of course. But timing of projects and having a lot of late-stage projects in what we're burning as we're going to start ramping up new studies, new studies are -- even if they have the same mix of pass-through costs, there's greater direct costs incurred earlier in a trial.

> I mean pass-through costs are late in the trial. A trial starts and -- some trials, you can get halfway through the trial in terms of direct fees, and we've earned half of our -- half of the revenue from our activities, and we haven't paid sites anything hardly. It's start-up, if it's a very short trial and start-up is a big part of it. So the pass-through parts of a trial are backloaded. So if you have a back-loaded portfolio stuff you're burning, you're going to have more pass-throughs as a -- pass-through

9

expenses at that time. So there's a number of things driving it. But yes, we do expect pass-through to maybe peak in Q4 or so and come down over '26.

\*　\*　\*

<Q: David Howard Windley – Jefferies – Analyst> So that's good timing. I'll come in right behind that. So August, in '23, '24, a lot of your peers saw their activity levels, which would be more akin to your kind of initial award timing moderate decline, begin to feel the impact of lower funding. And then for you, that materialized for Medpace, I should say, that materialized in the weaker book-to-bills more in the mid '24 timeframe as you saw some of that pre-backlog cancel out and not move forward, et cetera. So kind of the same timing dynamic sets up for what was a pretty weak funding environment in the first half of '25. So your last answer may have been pointing at me specifically, I'll take that. Why is this time difference -- why is this time different?

<A: August James Troendle> I don't know. The difference -- a big difference is this has been driven by cancellations, not weak business. There are many challenged clients, and that does affect the business environment. And there's been a really a highly unusual series of cancellations that we went through. But the business environment underlying it has always been pretty okay. And maybe you're saying, well, not real strong compared to what it had been a few years ago, but it's pretty good.

And despite all these huge cancellations out of this pre-backlog awarded study bucket, despite all of those, we still grew that bucket by 30% over the last year. It would have grown much faster, and we'd have a much bigger backlog at this point if we hadn't had those cancellations. But the difference is this has been driven by cancellations, not really weak funding environment causing lack of opportunities.

\*　\*　\*

<Q: Maxwell Andrew Smock – William Blair – Analyst> August, maybe one on the just expectations for book-to-bill here moving forward. You talked about initial awards being up 30% year-over-year. But based on kind of the midpoint of the guide here, I think you need to do 55% growth in bookings in 4Q to put up a 1.2 book-to-bill in the quarter. Can you help us bridge that gap? And maybe just elaborate on your booking expectations for 4Q and what you've embedded in your guide for bookings in 2026?

<A: August James Troendle>Yes. We're not giving a guide to '26, and I don't know where the bookings are going to come out. So I'm not going to get into trying to set them. *We did say that -- second half of '25, we did think that we could get to 1.15. We thought a reasonable chance of getting there, and that's kind of where we're*

10

*looking at towards Q4 as sort of the target. And I think that looks reasonable, but I'm not going to get into next year yet.*

<Q: Daniel Louis Leonard - UBS – Analyst> I'm curious how you would describe the breadth of outperformance in Q3. Would you attribute the upside to a narrow set of one to two customers? Or was it broader than that?

<A: August James Troendle> In terms of what, revenue?

<Q: Daniel Louis Leonard> Yes, exactly. Just looking at the revenue in Q3 compared to Q2, it looks like the growth came in top 5, it came in metabolic. I'm just looking for color on breadth versus what otherwise might suggest that there was just a big trial that landed in the quarter.

<A: August James Troendle> Kevin, do you want to...

<A: Kevin M. Brady> *Yes, Dan, I'd say it's pretty broad-based. I mean, certainly, some of that was just influenced by the pass-throughs. I mean pass-throughs continue to increase. I think for the quarter, we were right around 42%. So that certainly had an influence. But then also just the carryover of the improvements that we saw coming out of our conversation in Q2, where we saw improved funding in those studies progressing forward, the fewer cancellations in the second quarter and that translating further into the third quarter. So it's pretty broad-based. I wouldn't say it's isolated to a handful of studies.*

<Q: Justin D. Bowers - Deutsche Bank – Research Analyst> Okay. And then in terms of the pre-backlog, how does that -- how does the therapeutic mix of that compare to the revenue that you're showing right now? So just sort of frame things a little bit, like oncology is 30% -- was 30% in 3Q and like metabolic was 27%. When you look at the pre-backlog, is it over-indexed or under-indexed relative to those two therapeutic areas?

<A: August James Troendle> It's over-indexed in metabolic, as you might expect. Not massively, but there's a -- it's a higher proportion. And that, again, fits in with what we're currently seeing and burning.

[Emphasis added].

29.     The above statements in Paragraphs 21 to 28 were false and/or materially misleading by concealing and misrepresenting Medpace's new business environment and cancellation rates. In truth, Medpace consistently oversold the Company's projected book-to-bill ratio for fourth quarter 2025. In fact, Medpace knew or recklessly disregarded the impact that

11

cancellations have on the Company's book-to-bill ratio. Particularly, Medpace frequently claimed that the projection of a 1.15 book-to-bill ratio for fourth quarter 2025 was reasonable and achievable and that cancellations were not a sign of a weak business environment. Furthermore, Medpace reassured investors that the Company was not concerned about the lack of diversity in its pre-backlog. In fact, Medpace management stated that, despite the uptick in metabolic growth, the Company's upside was broad-based and not isolated to any handful of studies.

### *The Truth Emerges*

#### *February 9, 2026*

30.     On February 9, 2026, after the market closed, Medpace published fourth quarter 2025 earnings results revealing a book-to-bill ratio of 1.04, well below the Company's guidance. The press release, states, in relevant part:

> Backlog as of December 31, 2025 increased 4.3% to $3,027.2 million from $2,902.2 million as of December 31, 2024. Net new business awards were $736.6 million, representing a net book-to-bill ratio of 1.04x for the fourth quarter of 2025, as compared to $529.7 million for the comparable prior-year period. The Company calculates the net book-to-bill ratio by dividing net new business awards by revenue.

#### *February 10, 2026*

31.     On February 10, 2026, Medpace hosted an earnings call in association with the February 9, 2026 press release, wherein management discussed the Company's fourth quarter and full year 2025 results. In pertinent part, CEO Troendle stated:

> Good day, everyone. Cancellations were elevated again in Q4. Backlog cancellations in absolute and percent terms were the highest they've been in over a year. ***This resulted in a lower than anticipated net book-to-bill ratio of 1.04.***
>
> The good news is that with a backlog conversion rate of 23.6%, our book-to-bill rate does not need to be very high to generate growth. I see no reason to expect the higher level of cancellations to continue, but did not anticipate the spike in Q4. Only time will tell. Good opportunities continue to present themselves, and I rate the overall business environment is adequate and headed in the right direction.

12

[Emphasis added].

32. As part of the same call, President Geiger stated, in relevant part:

Good morning, everyone. Revenue in the fourth quarter of 2025 was $708.5 million, which represents a year-over-year increase of 32% and full year 2025 revenue was $2.53 billion, a 20% increase from 2024. Net new business awards entering backlog in the fourth quarter increased 39.1% from the prior year to $736.6 million, resulting in a 1.04 net book-to-bill. For the full year 2025, net new business awards were $2.65 billion, an increase of 18.7%. Ending backlog as of December 31, 2025, was approximately $3 billion, an increase of 4.3% from the prior year.

33. As part of the earnings call, Defendants answered analysts questions during a question-and-answer segment, in pertinent part:

<Q: Justin D. Bowers – Deutsche Bank – Analyst> Okay. Is there any way to help us understand if the cancellations were normal, what the -- what sort of like the net bookings would be? And then with those cancellations, was that -- could you help characterize those a bit more? Was it in any therapeutic area or customer area, vintage?

<A: August James Troendle> No. Cancellations were a little bit skewed towards metabolic area that's been growing quite a bit. So there were a higher level of cancellations there. Overall bookings have continued to be oncology our strongest. Metabolic still there, but there were some elevated cancellations. So it was kind of otherwise relatively normal. I don't have a -- we're not providing what the booking would have been -- we don't give gross bookings. We're just netting them out kind of directional magnitude of cancellations, but they would have been substantially higher if we had cancellations in a nice range.

34. Investors and analysts reacted immediately to Medpace's revelation. The price of Medpace's common stock declined dramatically. From a closing market price of $530.35 per share on February 9, 2026, Medpace's common stock price fell to $446.05 per share on February 10, 2026, a decline of more than 15.9%.

35. A number of well-known analysts who had been following Medpace expressed surprise and concern at the Company's discouraging results. In particular, on February 9, 2026, Baird Equity Research published a report titled "Expect Shares Under Pressure Tomorrow" following Medpace's press release. The report highlighted Medpace's miss, in pertinent part:

13

Here's the rub: 1) backdrop of sector controversy and valuation collapse, 2) Q4 bookings miss (1.04x NBB), 3) 76% of Q4 growth was from Indirect revenue, 4) majority of 4Q EPS beat was tax rate, 5) as healthy as 2026 growth outlook is, it is a fraction of 2021-2025 levels, while 6) MEDP's peer-relative valuation is stretched well beyond norm.

36.     Similarly, on February 10, 2026, Truist published a report titled "Let's Play Q&A: Digging into 4Q Cancellations and the Roadmap Into 2026," wherein analysts lowered Medpace's price target to $539 from $555. The report states, in relevant part:

> MEDP shares have historically traded at a premium to other CROs, as the company has been viewed as a "preferred" name in the space - supported by strong recent results, improving biotech trends (RFPs/pipeline/ funding), high exposure to the biotech segment, and its perceived insulation from AI-related noise. As a result, the sequential decline in B2B and the increase in cancellations came as a surprise to many investors. While the company attributed the softer B2B to higher cancellations in metabolic trials and expects cancellations to normalize in 2026, investor sentiment took a modest step back, driving shares down 16% today. We view MEDP's results as reflective of the inherent volatility in its business model given its concentrated exposure, as well as the limited visibility associated with its pre-backlog. We revise our estimates and price target, and we reiterate our Hold rating.

37.     The fact that these analysts, and others, discussed Medpace's fourth quarter 2025 book-to-bill miss suggests that the public placed significant weight on Medpace's prior statements. The frequent, in-depth discussion by Medpace of the Company's book-to-bill guidance and projections confirms that Defendants' statements during the Class Period were material.

### *Additional Scienter Allegations*

38.     During the Class Period, Defendants acted with scienter in that they knew or otherwise were deliberately reckless in not knowing that the public statements disseminated on behalf of Medpace were materially false and misleading at the time they were made. Defendants had actual knowledge of, or access to, non-public information concerning the Company's pre-backlog and how that would translate to Medpace's book-to-bill ratio once cancellations had been

14

factored into the equation. Despite such knowledge, Defendants repeatedly conveyed to investors that a book-to-bill ratio of 1.15 was a reasonable projection for fourth quarter 2025.

39.     In fact, Defendants knew or deliberately disregarded that the therapeutic segments wherein Medpace was observing growth may not remain consistent throughout fourth quarter 2025. In particular, Defendants assured investors that revenue streams were broad-based and not isolated to any few studies. In contrast, the fourth quarter book-to-bill ratio was negatively impacted by backlog cancellations, particularly those in the metabolic area.

### *Loss Causation and Economic Loss*

40.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Medpace's common stock and operated as a fraud or deceit on Class Period purchasers of Medpace's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Medpace's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Medpace's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

### *Presumption of Reliance; Fraud-On-The-Market*

41.     At all relevant times, the market for Medpace's common stock was an efficient market for the following reasons, among others:

> (a)     Medpace's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b) Medpace communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) Medpace was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about Medpace was reflected in and incorporated into the Company's common stock price during the Class Period.

42.    As a result of the foregoing, the market for Medpace's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Medpace's common stock price. Under these circumstances, all purchasers of Medpace's common stock during the Class Period suffered similar injury through their purchase of Medpace's common stock at artificially inflated prices, and a presumption of reliance applies.

43.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense

that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine

44.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with material information concerning the Company's anticipated book-to-bill ratio for fourth quarter 2025. These statements were not forward-looking and/or omitted material information about existing events and circumstances.

45.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

46.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Medpace who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any

17

of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

47.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Medpace's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

48.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Medpace's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Medpace or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of February 6, 2026, there were 28.4 million shares of the Company's ordinary shares outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

18

49.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

50.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

51.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Medpace;

(c)     whether the Individual Defendants caused Medpace to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of Medpace's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

52.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

53.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

55.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of common stock. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Medpace common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Medpace's common stock at artificially inflated prices. In furtherance of this unlawful

20

scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

56. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Medpace's common stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

57. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

58. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Medpace's internal affairs.

21

59. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Medpace's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Medpace's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Medpace's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

60. During the Class Period, Medpace's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Medpace's common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Medpace's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Medpace's common

stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

61.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

62.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

63.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

64.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Medpace's misstatements.

65.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Medpace which had become materially false or misleading.

23

66.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Medpace disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Medpace to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Medpace's common stock.

67.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Medpace to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

68.     By reason of the above conduct, the Individual Defendants and/or Medpace are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 6, 2026                                   Respectfully submitted,


                                                       /s/ Richard S. Wayne
                                                       **STRAUSS TROY CO., LPA**
                                                       Richard S. Wayne, Attorney Bar No. 0022390
                                                       Robert S. Sparks, Attorney Bar No. 0073573
                                                       150 East Fourth Street, 4th Floor
                                                       Cincinnati, OH 45202
                                                       Tel.: (513) 621-2120
                                                       Fax:(513) 629-9426
                                                       Email: rswaynef@strausstroy.com
                                                       Email: rrsparks@strausstroy.com

                                                            -and-

                                                       **LEVI & KORSINSKY, LLP**
                                                       Adam M. Apton (*pro hac vice* forthcoming)
                                                       33 Whitehall Street, 27th Floor
                                                       New York, New York 10004
                                                       Tel.: (212) 363-7500
                                                       Fax: (212) 363-7171
                                                       Email: aapton@zlk.com

                                                       *Attorneys for Plaintiff*

25

# CERTIFICATION OF NAMED PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, Jan Durbin                                    , duly certify and say, as to the claims asserted under the federal

Name

securities laws, that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transaction(s) in Medpace Holdings, Inc. which are the subject of this litigation during the class period set forth in the complaint are set forth in the chart attached hereto.

5. Within the last 3 years, I have not sought to serve nor have I served as a class representative in any federal securities fraud case.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I certify under penalty of perjury that the foregoing is true and correct. Executed this:

2/20/2026

Date

Jan Durbin

Name

Signature

| Date of Transaction | Transaction Type | Quantity | Price per Share |
| --- | --- | --- | --- |
| 11-06-2025 | P | 12 | $ 597.3500 |
| 11-06-2025 | P | 12 | $ 601.2800 |